[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 755 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 756 
This appeal and cross-appeal involve the right to strip-mine coal pursuant to leases and other agreements between Drummond Company, Inc., and United Land Corporation and its parent, Walter Industries, Inc. ("Walter"), or the predecessors to those entities. Multiple agreements are involved, the first of which was executed nearly 40 years ago.
In case no. 1041029, we affirm. In case no. 1041221, we affirm in part and reverse in part.
 Parties
United owns coal-bearing lands and Drummond is engaged in the business of coal-mining. In the late 1960s and early 1970s, predecessors in interest to Drummond and United entered into agreements allowing Drummond to strip-mine coal from lands belonging to United.[1]
In addition to Drummond and United, Walter, Jim Walter Resources, Inc. ("JWR"), United States Pipe and Foundry Company ("U.S. Pipe"), and Tuscaloosa Resources Inc. ("TRI") were also at one time parties to this action. U.S. Pipe is a sister corporation of United. The parties refer to "old U.S. Pipe" and "new U.S. Pipe." Old U.S. Pipe is a predecessor in interest to United; new U.S. Pipe was created after a corporate reorganization-corporate bankruptcy. Old U.S. Pipe was not named as a defendant in this action; new U.S. Pipe was named.[2] JWR is another sister corporation to United. Walter is the parent corporation of United, JWR, and U.S. Pipe. Walter and its subsidiaries — JWR, U.S. Pipe, and United — are sometimes hereinafter referred to collectively as "the United defendants." TRI is not related to the United defendants but, like Drummond, leased mineral rights from United at certain times.
 Factual Background
Drummond and United have a longstanding business relationship. In the late 1960s and early 1970s, Drummond's predecessors and United's predecessor entered into four coal-mining leases. These leases granted Drummond the right to strip-mine certain lands belonging to United. In exchange, Drummond agreed to pay royalties to United for the coal mined from those lands. The parties refer to these agreements individually as "the Beltona lease," "the Kellerman lease,"[3] "the Cluster Springs lease," and "the Flat Top *Page 758 
lease." In this opinion, we sometimes refer collectively to these leases as "the four original leases."
Although they shared many common provisions, each of the four original leases varied as to the beginning and ending dates; the location of the coal seams to be mined; the royalty rates to be paid; and the depth of the allowed or required mining activity.[4] The Beltona lease was effective October 1, 1967, until September 30, 1982; the Kellerman lease was effective February 1, 1968, until May 30, 1983; the Cluster Springs lease was effective April 1, 1972, until March 31, 1979; and the Flat Top lease was effective November 1, 1969, until October 31, 1984. After these leases were executed, the predecessors to Drummond and United operated for years under the terms stated in the leases without significant problems or disputes.
On November 10, 1972, Drummond's predecessors and United's predecessor entered into another agreement, which the parties refer to as "the 1972 Agreement." This agreement addressed mining rights in the Warrior Coal Basin.[5] Under the 1972 agreement — which was executed before the expiration of any of the four original leases — United agreed (1) that it would "extend the terms of leases presently held by Drummond to the extent necessary for Drummond to complete mining the strippable coal"; (2) that it would "lease to Drummond the right to strip-mine United's remaining strippable coal within the Warrior Coal Basin"; and (3) that "lands currently under lease to third parties [would], at the expiration of said leases, and at the option of Drummond be leased to Drummond." United also agreed that the leases executed pursuant to the 1972 agreement would be at "existing royalty rates" and on United's "standard lease form," to which United agreed to make certain specified modifications. We refer to these three clauses as the "will-extend clause," the "will-lease clause," and the "third-party-option clause," respectively.
In exchange for these rights, Drummond assigned to United certain of its then existing underground mining rights in Tuscaloosa County, as well as any underground mining rights it might later acquire in Tuscaloosa County. Drummond also agreed that in exchange for the right to mine certain properties United had previously leased to third parties, Drummond would guarantee to United the same monthly minimum royalties United had been receiving from those third parties.
After the execution of the 1972 agreement, the parties negotiated only one "new" lease — the Bagley Bend lease. Drummond and United's predecessor entered *Page 759 
into this lease on May 12, 1974. For the Bagley Bend lease, the parties used United's standard lease form referenced above, but, as before, they particularized certain provisions of the lease — the beginning and end dates of the lease, the particular coal seam to be mined, and the applicable royalty rates — to the Bagley Bend location.
Additionally, Drummond exercised the option granted it under the third-party-option clause by leasing certain lands belonging to United that had been formerly leased to third parties. The parties accomplished this not by entering into new lease agreements, but by modifying one or more of the four original leases to include these "third-party lease" properties. The parties do not dispute that they fulfilled their agreement as to this third-party-option clause.
After the execution of the 1972 agreement, Drummond began mining additional properties belonging to United, which appeared to be in conformity with the will-lease clause of the agreement. However, Drummond and United did not execute new leases for these properties. As they did with the leases entered into under the third-party-option clause, they executed "modification agreements" to the four original leases, thereby extending the scope of the four original leases to add these additional properties. Drummond and United operated in this manner for some time.
At various times, United requested that Drummond release certain properties from the scope of the parties' agreements so that United could use the property in another manner. As to those properties for which Drummond had no use, Drummond agreed and executed the requested releases.
By the mid-1980s, the four original leases had expired according to their express terms. Additionally, the Bagley Bend lease expired in 1985. However, Drummond and United continued their business relationship beyond those dates, operating in the same manner as they had before the expiration of those leases.
In the late 1980s and 1990s, JWR and the other subsidiaries of Walter, including old U.S. Pipe and United, underwent a complex corporate reorganization, referred to as the "Mirror Liquidation Plan," and a bankruptcy reorganization pursuant to11 U.S.C. § 101 et seq. United emerged from this reorganization as the successor to old U.S. Pipe, the entity named in the coal-mining leases with Drummond.
In March 1989, Drummond forwarded to United a proposed lease, which Drummond indicated was "in accordance with the agreement of November 10, 1972, between our companies or their predecessors." Drummond proposed to execute a separate lease for each existing mine and to include a "catch-all" lease covering the remainder of United's land (presumably all those lands belonging to United as referenced in the 1972 agreement) that was not currently "assigned to a Drummond mine." United rejected this proposal as significantly and drastically different from the lease forms previously executed by the parties.
Despite their inability to execute any new leases, Drummond and United continued to conduct business without significant problem until the early 1990s. In 1991 Drummond and United entered into a letter agreement, which we refer to as "the 1991 agreement."[6] *Page 760 
Pursuant to the 1991 agreement, Drummond released to United those properties listed in Appendix I to the 1991 agreement, i.e., areas nonessential to Drummond and/or impracticable to strip-mine. Also as agreed in the 1991 agreement, Drummond and United entered into a written lease concerning the Nebo/Chetopa mine.
At various times during the relationship between Drummond and United, Drummond stopped mining at certain locations covered by the parties' agreements. According to Drummond, it ceased mining at Kellerman mine no. 1 in December 1990; Drummond also acknowledged that it ceased mining at Beltona in December 1991. According to Drummond, United neither objected to this cessation nor claimed that the cessation constituted a breach, forfeiture, or abandonment under the parties' agreements.[7] According to Drummond, it ceased mining at Kellerman mine no. 2 in December 1995. Again, United did not object to this cessation.
In November 1995, United entered into an agreement to sell certain of its property to Alawest-AL., L.L.C. Drummond objected to this sale, claiming that, under the 1972 and 1991 agreements, it held the surface-mining rights to the property made the subject of the sales contract. As a result of Drummond's objection, Drummond and United, on January 24, 1996, entered into another agreement, which we refer to as the "1996 agreement." In this agreement, Drummond and United stated that they desired to modify the "Tuscaloosa County agreement."[8]
Also on January 24, 1996, Drummond and United executed another agreement entitled "Memorandum of Agreement." Drummond recorded this memorandum of agreement in the Tuscaloosa County Probate Office. On January 25, 1996, the day after the memorandum of agreement and the 1996 agreement were executed, United and Alawest amended their sales contract to acknowledge Drummond's surface-mining rights.
Also in January 1996, United's corporate counsel forwarded a proposed lease form to Drummond. Drummond refused to execute the lease, claiming that this proposed lease contained substantially and significantly different provisions than did the lease forms the parties had executed in the 1960s and 1970s.
Although Drummond declined to enter into the lease proposed by United in January 1996, in August 1996, Drummond communicated to United its suggested modifications regarding the proposed lease. Thus, Drummond appeared agreeable to negotiating a modified version of the proposed lease form. However, these negotiations did not result in the execution of new leases by Drummond and United.
In April 1997, United requested and obtained from Drummond another release of property the parties considered to be covered by the 1972 and 1991 agreements. In June 1997, Michael Hendon, writing on behalf of Drummond, corresponded with *Page 761 
United regarding the proposed lease forms:
 "Some time ago, Drummond Company, Inc., delivered to Mr. B.T. Crowe changes and edits to the new Surface Mining Leases that are to be worked out as per Part 2 of the 1991 letter agreement between United Land, Jim Walter Resources, and Drummond. At your earliest convenience, we are ready to meet with you and come to an agreement on the proposed new leases.
 "Until such time as the new leases are fully executed by both parties, we are still operating under all of our existing agreements including the 1972 `Master Agreement' that covers all of [United's] surface mineable properties in the Warrior Coal Basin, except those parcels that have been specifically released via written consent from Drummond."
In June 1997, United entered into a coal-mining lease with TRI regarding property referred to as the "Panther Mine property." The Panther Mine property was within the scope of the Kellerman lease, as amended by the 1972 and 1991 agreements. Drummond learned of this lease in July 1997 and objected to United's entering into the lease with TRI; Drummond asserted that it had superior rights to the surface-mining rights at the Panther Mine property based upon the existing agreements between Drummond and United.
In November 1997, Drummond and United resolved their dispute regarding the Panther Mine property by Drummond's executing a release of that property from the 1972 and 1991 agreements. In exchange for the release, United agreed to pay Drummond an "override royalty" based on the coal production at the properties. In the release, the parties acknowledged that the Panther Mine property was within the scope of the Kellerman lease and the 1972 agreement.
In May 1998, Michael Hendon, writing for Drummond, corresponded with United regarding the property covered by the Flat Top lease. In this letter, Hendon stated:
 "Per your request, enclosed is a map showing the remaining mine life for Flat Top. The total remaining tonnage from June 98 through May 99 is estimated as [a specific number of] saleable tons. . . . The estimated royalty income for [United] is [indicating a dollar figure and a calculation of rate per ton].
 "There are additional reserves beyond the projected June 99 final high-wall line. Due to old works in the Pratt seam and the close proximity to the Portercrest Community (and associated blasting problems), we are not projecting to recover any coal beyond the June 99 high-wall line. It is possible we could mine additional tonnage beyond June 99, but the odds are against it at this time. As a result, we have excluded this tonnage from our current mining plans."
In October 1998, Drummond and United entered into another release and override agreement, in this one addressing property referred to as "Panther Creek No. 2."[9] Drummond agreed to release to United its leasehold rights to the Panther Creek No. 2 property; in exchange, United agreed to pay another override royalty to Drummond. *Page 762 
In this agreement, the parties referenced the 1991 agreement.
Also in October 1998, Drummond and United entered into a third release and override agreement. This release and override agreement addressed the "Peterson area." As with the other override agreements, United agreed to pay Drummond an override royalty based on the value of the coal mined at the Peterson area in exchange for Drummond's release of that property from the scope of the Kellerman lease, the 1972 agreement, and the 1991 agreement. The release executed by Drummond and United specifically referenced these agreements.
According to Drummond, it ceased mining at the property covered by the Flat Top lease in November 1998. Also according to Drummond, United neither objected to this cessation nor claimed that the cessation of mining by Drummond constituted a breach, forfeiture, or abandonment under the parties' agreements.
In August 1999, Michael Hendon, writing for Drummond, sent United a monthly royalty report based on sales of coal mined pursuant to the Flat Top lease. In his cover letter, Hendon indicated that "[t]his [Flat Top] inventory has been depleted." Although Drummond had ceased its actual mining efforts at the Flat Top property as of November 1998, Drummond's dragline and other personal property from its mining activities remained on the Flat Top property.[10]
By letter dated September 7, 1999, United requested from Drummond "information relative to any proposed or projected mining by Drummond . . . on United Land property in Tuscaloosa County." United stated that it was "currently involved in a 5 year land use plan. . . . and must study future mining activities projected by Drummond in the immediate future." According to United, Drummond did not respond to this request for information.
In January 2001, United entered into another lease with TRI granting TRI the right to surface-mine at property referred to as "the Carter Mine property" ("the Carter Mine lease"). Portions of the property described in the Carter Mine lease were within the scope of the property described in the original Kellerman lease. However, all the property described in the Carter Mine lease was covered by the 1972, 1991, and 1996 agreements executed by Drummond and United.[11] In February 2001, Drummond corresponded with United regarding its January 2001 lease with TRI. Additionally, Drummond notified TRI by letter that Drummond claimed to possess all surface-mining rights on the Carter Mine property, pursuant to its 1972, 1991, and 1996 agreements with United. Drummond indicated that it had *Page 763 
not released those rights and that it would require an override royalty before granting such a release. Drummond also demanded that TRI cease all mining activities until the parties had entered into an override agreement.
On February 26, 2001, an attorney acting on behalf of United corresponded with Drummond regarding Drummond's claim that it controlled the surface-mining rights at the Carter Mine property. United's attorney denied that Drummond held any existing rights to mine on United's property and requested that Drummond forward a copy of the lease or agreement on which Drummond was basing its claims.
On October 29, 2001, Drummond sued United, Walter, JWR, and TRI, in the Jefferson Circuit Court.[12] That complaint, as finally amended, asserted claims of breach of contract, intentional interference with business relations, trespass, conversion, and fraudulent suppression.
In August 2002, United entered into an agreement with Construction Management Services, L.L.C. ("CMS"). This agreement was entitled "Jefferson County Option Agreement For Saleof Real Estate."[13] The real estate made the subject of this agreement was the same property referenced by the Flat Top lease. CMS planned to develop a landfill on the property. United and CMS subsequently entered into several amendments to extend the closing date for this agreement. United asserted at trial that CMS refused to close on the Flat Top property until Drummond removed its dragline and other chattels from that property and that, as a result of Drummond's refusal to remove its property, United was incurring substantial damages.
In October 2002, United, by and through its attorney, notified Drummond in writing that Drummond was in default of the parties' agreements and that it was terminating all remaining leases, if any existed, because of Drummond's defaults.[14] United also demanded a refund of all moneys paid to Drummond as override royalties "with respect to coal mined from [United's] properties in the Warrior Basin."
In December 2003, Garry Drummond wrote to United indicating a desire to renew mining efforts on certain of United's properties. Drummond wrote:
 "Notwithstanding the lawsuit . . ., we hereby put you on notice that we are willing, able, and desirous of going to specific leases on the properties in Appendix II, and some of the properties listed in Appendix III, . . . attached to the so called 1991 Agreement. We are also willing, able and desirous to meet with you to identify properties in Appendix III for declaration as to `essential' or `non-essential' surface mineable properties as also called for by the 1991 Agreement. We have been damaged and continue to be damaged in a substantial manner with the ability to mine on these properties. This prohibition of mining is brought about by your unwillingness to allow access.
 "Further, we are experiencing a very strong market for our coal . . . and the *Page 764 
increased price of coal in general [is] making these properties very profitable at this time. We estimate that we could have been and could continue to be mining at a rate of one and one half million to two million tons of coal per year. Therefore, your denial of access is costing Drummond cash flows of [$] per ton amounting to damages in excess of [millions $] per year."
United responded favorably to this proposal, and it appeared that negotiations between Drummond and United were proceeding in a positive manner. However, Drummond and United, once again, could not agree, and this action continued.
 Procedural Background
In its complaint as finally amended, Drummond asserted breach of the 1972 and 1991 agreements (as a result of United's leasing the Carter Mine property to TRI) (Count I); breach of the 1972 and 1991 agreements (by precluding Drummond from mining) (Count ID; intentional interference with business relations alleged against Walter and JWR (Count III); trespass against United and TRI (Count IV); conversion by United and TRI of coal to which Drummond claimed a superior right (Count V); and fraudulent suppression against United (Count VI). At one point in the litigation, Drummond claimed damages up to $500 million.
United answered the complaint and asserted counterclaims against Drummond.[15] In these counterclaims, United alleged that Drummond had breached the Beltona, Kellerman, and Flat Top leases by failing to mine continuously; by failing to pay minimum monthly royalties; and by failing to provide documentation of all strip-mining operations at reasonable intervals (Count I); that Drummond had fraudulently misrepresented that it had removed all strippable coal from the lands covered by the Beltona, Kellerman, and Flat Top leases (Count II); that United was entitled to a judgment declaring that Drummond was estopped from asserting any further rights to the properties covered by the Beltona, Kellerman, and Flat Top leases (Count III); that Drummond had breached the 1972 and 1991 agreements either (a) by failing to enter into leases, surface mine, and pay royalties to United with respect to lands described in Appendices II and III of the 1991 agreement or (b) by failing to release those lands to United when they became nonessential to Drummond's operations (Count IV); that Drummond had fraudulently induced United to enter the 1991 agreement when Drummond had no intent to perform the material obligations of that agreement (Count V); that Drummond had fraudulently suppressed the fact that, when it entered into the 1972 and 1991 agreements, Drummond had no intent to execute standard leases with United and proceeded to strip-mine United's lands and that Drummond had no intent to release those nonessential lands (Count VI); that it was entitled to a judgment declaring that Drummond had relinquished its rights under the 1991 agreement by refusing to enter into leases with United, failing to pay royalties to United, and ceasing all mining activity (Count VII); that Drummond had fraudulently misrepresented that the lands made the subject of the override agreements were essential to Drummond's mining plans or that Drummond had fraudulently concealed from United the fact that those lands were not essential to Drummond's mining plans (Count VIII); that Drummond had been unjustly enriched as a *Page 765 
result of the override royalty payments (Count IX); that Drummond had slandered United's title to certain property by Drummond's communications with TRI (Count X); that Drummond had slandered United's title by untimely releasing or refusing to release United's lands (Count XI); and that Drummond had intentionally interfered with contractual relations by asserting to TRI its superior rights to United's coal (Count XII). As its counterclaims were finally stated, United asserted that it had sustained up to $350 million in damages.[16]
On April 4, 2002, Drummond agreed that, as a result of the petition for bankruptcy filed by the United defendants, Drummond was not entitled to pursue claims for any acts or omissions occurring before March 2, 1995. On May 27, 2003, TRI answered Drummond's complaint and asserted its own counterclaims of intentional interference with business relations and unjust enrichment.
In August 2004, United filed a supplemental counterclaim seeking permanent injunctive relief requiring Drummond to remove its dragline and any other machinery, structures, and personalty from the property made the subject of the Plat Top lease.
Discovery in the litigation was extensive, covering some three and one-half years and including approximately 45 depositions. All parties moved for a summary judgment.
On January 18, 2005, the trial court conducted a hearing on United's counterclaim for injunctive relief. Additionally, on March 23, 2005, the trial court heard arguments on the summary-judgment motions. On March 29, 2005, the trial court issued a lengthy order on these motions. The trial court stated:
 "This case came to be heard on all parties' motions for summary judgment. There are a number of disputed factual issues. The court will consider the evidence most favorably to the non-moving parties in ruling on the motions.
 "There are some global issues that must be decided before the court rules on the specific claims of the parties. These global issues are interwoven, and affect each other. These issues are as follows:
 "1. Have the four leases made the basis of this lawsuit expired as a matter of law?
 "2. What was the 1972 agreement between the parties and what is the effect of various provisions of the 1972 agreement?
 "3. Is the 1972 agreement ambiguous such as to allow extrinsic evidence to explain it, and the parties' intent?
 "4. What was the effect of the 1991 agreement of the parties?
 "5. What was the effect of the 1996 agreement?
 "The four (4) leases made the basis of this suit are: the Kellerman lease, Flat Top lease, Cluster Springs lease, and Beltona lease. Three (3) of these leases were for a term of fifteen (15) years. The Kellerman lease was entered into on 1/12/68,[17] and expired by its terms on 5/30/83. The Flat Top lease began on 11/1/69 and expired by its terms *Page 766 
10/31/84. The Beltona lease was entered into on 10/1/67, and expired by its terms 9/30/82. The Cluster Springs lease began 6/6/72[18] and expired by its terms 3/31/79.
 "There was a clause in the 1972 agreement that purported to modify the terms of these leases by extending them `to the extent necessary for plaintiffs to mine the strippable coal.' As defendants pointed out, this provision is void for uncertainty as to the term of the extension (See Linton Coal Company v. South Cent. Resources[, Inc.,] 590 So.2d 911
[(Ala. 1991)]. This resolves global issue number one (1), in that, these four (4) leases all expired by their terms at the end of their terms. The court will later relate this finding of law to claims in the case.
 "Global issue number two (2) involves a characterization of the 1972 agreement. It is obvious that the agreement was not a lease, and did not operate to extend existing leases. The defendants have characterized the agreement as an agreement to agree. [Drummond has] characterized it as a sale or exchange of coal rights, or the creation of a license coupled with an interest. The agreement was not a sale because there were no words of grant, demise, or conveyance. There were words that coal rights were being exchanged. To see what rights were being exchanged the court must look to the four (4) corners of the agreement. The agreement provides for the assignment of the four (4) leases made the basis of this suit, the right or option to lease the remaining lands of the defendant not under lease, and the option to lease certain lands then leased to 3rd parties, at the expiration of those leases. It is clear from this language, that the parties intended for the remaining land of the defendant to be mined by lease, and there is no expressed intent to create a license. Since the agreement was an open ended option to lease the remaining lands, the option agreement would expire (2) years after its execution unless exercised (Code of Alabama 35-4-76(a)).
 "[Drummond] did exercise its option, within the two (2) year period, to assume three (3) of the third-party lease[s] ([United's] exhibit 111, 112, 18, and 19) at the expiration of these lease terms the leases became tenancies at will. (Linton Coal case above).
 "As to the lands covered by the expired leases, [Drummond] became a holdover tenant, or a tenant at will. [Drummond's] rights in the leasehold estates continued until the defendant terminated the leases by letter of 10/18/02.
 "Pursuant to the 1972 agreement, [Drummond] and defendant United Land, from time to time, and during the term of the leases, added lands to the existing leases. The duration of the leases were not changed by any of the modifications.
 "The third global issue is whether the 1972 agreement is ambiguous such as to allow extrinsic evidence of the parties['] intent. While the indefinite extension of the leases clause is void as a matter of law, the interests of the parties is clear from the four (4) corners of the document. This court cannot find a patent or latent ambiguity such as to allow extrinsic evidence to explain or modify its terms.
 "The fourth global issue involves the legal effect of the 1991 agreement. In *Page 767 
this agreement [Drummond] released from the tenancy at will, all non-essential lands listed in Appendix I of the agreement. An option was given to [Drummond] to release the properties listed in Appendix II. The land in Appendix III remained under the tenancy at will.
 "[United] also granted to [Drummond] an option to lease . . . the rights to mine the Nebo Coal adjoining their Chetopa Mine. This option was exercised, and a lease signed. The other provisions of the 1991 agreement are not pertinent to this case.
 "No other leases were ever executed by the parties, on any other properties made the basis of this suit. Therefore, these other properties remained leased to [Drummond] under a tenancy at will. "The fifth global issue is what effect did the January 24, 1996, agreement have on the parties. The plain wording of the 1996 agreement is as follows:
 "`1. The properties set forth in exhibits A and B were added to the Tuscaloosa County (1972) agreement.
 "`2. The Tuscaloosa County agreement shall be and remain in full force and effect according to all the terms, conditions, and covenants as hereby modified and amended.'
 "Based on the court[s] above legal conclusions, the only legal effect this document could have, would be to grant a new two (2) year option to [Drummond] to lease [United's] lands. The tenancy at will as to the four (4) expired leases would remain in effect, until and unless, new leases were executed.
 "This resolves the five (5) preliminary global issues. The court will now turn to the other pertinent undisputed factual issues. On 6/27/97 defendant United Land leased a portion of the property described in the Kellerman lease to defendant TRI for surface mining. This property was still subject to [Drummond's] tenancy at will. [Drummond] on 7/1/97 notified defendant United Land of its position that this property was still subject to its lease with said defendant. Defendant United Land paid override royalties on this property.
 "In October 1988, [Drummond] was paid override royalties on two (2) additional leases. On 1/2/01, defendant United land entered into a fourth lease with defendant TRI to mine the Carter properties in Tuscaloosa County. Defendant United Land did not pay any override royalties to [Drummond] on the fourth lease. Defendant United Land terminated [Drummond's] tenancy at will on 10/18/02.
 "The court will now consider the claims of [Drummond] in the context of these legal findings. As to count one (1) of [Drummond's] complaint [Drummond] is entitled to partial summary judgment as a matter of law as to the properties leased to TRI under the 1/2/01 lease. This property was still subject to [Drummond's] tenancy at will. A tenancy at will is not terminated till [sic] the lessor gives a reasonable notice to quit (Melson v. Cook, 545 So.2d 796
[(Ala. 1989)]). [Drummond] is entitled to damages up till [sic] the date defendant United Land terminated [Drummond's] tenancy at will.
 "As to count two (2) of [Drummond's] complaint, [Drummond] is entitled to summary judgment to the extent it is claiming damages up to the date the tenancy at will was terminated. To the extent count two (2) seeks damages for breach of contract after the tenancy at will was terminated, summary judgment is granted in favor of defendant United Land and against [Drummond]. *Page 768 
 "Count three (3) of the complaint involves party defendants other than defendant United Land and TRI. This count claims that defendants Walter Industries, and JWR intentionally interfered with rights [Drummond] had under the 1972 and 1991 agreements. Applying the legal findings of this [court], [Drummond's] only rights arose out of the hold over tenancy after the leases expired. Therefore, these defendants are entitled to judgment as a matter of law, since [Drummond] had no remaining rights under the 1972 and 1991 agreements at the time suit was filed.
 "Count four (4) seeks damages for trespass. An owner of land cannot commit a trespass on its own property. Defendant United Land had the right to go on, and use its own land as long as it did not interfere with [Drummond's] mining rights. Defendant United Land is entitled to judgment as a matter of law. Defendant TRI was actually mining on the leasehold property under the 2001 lease, and there are factual issues as to whether or not these actions constituted a trespass as to [Drummond's] leasehold estate up till [sic] October 18, 2002, when [Drummond's] leasehold was terminated.
 "Count five (5) claims conversion of the coal by defendants United Land Company and TRI. The gist of conversion is the interference with possession or right of possession of a chattel. There are factual issues precluding summary judgment as to the coal severed by TRI under the 2001 lease up to the time of termination in October 2002. All defendants are entitled to summary judgment on any other conversion claim.
 "Count six (6) claims fraudulent suppression against defendant United Land Company. To the extent said count claims damages against United Land under the 2001 lease to TRI up to October 2002, there are factual issues precluding summary judgment. There is no duty to communicate on the part of the other defendants, and summary judgment is due to be granted as a matter of law in favor of all defendants except defendant United Land.
 "As to [Drummond's] complaint partial summary judgment is granted in accordance with the above conclusions of law, and considering the evidence most favorably to the non-moving party. [Drummond] conceded at the summary judgment hearing that summary judgment should be granted in favor of defendant U.S. Pipe and Foundry, Inc., on all claims and the same is granted.
 "The next consideration is defendant United Land Company's counterclaim. Count 1 claims breach of contract as to the Beltona, Kellerman, and Flat Top leases. These leases having all expired in the 1980's, and [Drummond] having mined under a tenancy at will subsequently to the expiration of said leases, [Drummond] is entitled to judgment as a matter of law on count one (1).
 "Count two (2) claims fraudulent misrepresentations regarding the Beltona, Kellerman, and Flat Top leases. These leases having expired in the 1980's, and before the misrepresentations were allegedly made, [Drummond] is entitled to judgment as matter of law.[1]
 "Count three (3) of the counterclaim asks for a declaratory judgment concerning the Beltona, Kellerman, and Flat Top leases. This count is moot since the court has found as a matter of law [United] terminated [Drummond's] leasehold estate in October of 2002.
 "Count four (4) of the counterclaim claims a breach of contract of the 1972 and 1991 agreement. [Drummond] is *Page 769 
entitled to judgment as a matter of law on this claim.
 "Count five (5) claims fraud in the inducement of the execution of the 1991 agreement. As to the claim assuming it to be factually true, [United] had knowledge of information from which it should have discovered the falsity more than two (2) years prior to the date the lawsuit was filed. Therefore, the statute of limitations having expired, [Drummond] is entitled to summary judgment as to count five (5) as a matter of law.
 "Count six (6) claims fraudulent suppression of [Drummond's] intent not to perform material obligations under the 1972 and 1991 agreement. Defendant United Land was aware more than two (2) years prior to the lawsuit of facts, that should have lead to the discovery of the alleged fraud, and [Drummond] is entitled to judgment as a matter of law on this claim.
 "Count seven (7) seeks a declaratory judgment concerning the 1991 agreement. This count is now moot.
 "Count eight (8) claims misrepresentation and fraudulent concealment with respect to the four (4) override agreements. There are factual issues on this claim that preclude summary judgment.
 "Count nine (9) claims unjust enrichment through the override agreements. The only way this claim would be viable is if the jury finds [Drummond] fraudulently suppressed that it had no intention of mining the land subject to the override leases, or misrepresentation that it intended to mine these land[s] when it did not intend to mine them. In that event, the claim would be subsumed within the fraud claim of count eight (8), and [Drummond] is entitled to summary judgment as a matter of law on count nine (9).
 "Counts ten (10) and eleven (11) claim slander of title of United Land's property. Both the claims are barred by the two (2) year statute of limitations. Since the slander of title claims are not a plea in recoupment, they do not relate back to the date of filing of [Drummond's] complaint.
 "Further, by virtue of [Drummond's] tenancy at will it had, at least, color of title in the lands which would bar a slander of title claim.
 "Finally count twelve (12) claims interference with contractual relations. This claim arises out of [Drummond's] communications with TRI in 2001. Since this communication was prior to defendant United Land terminating [Drummond's] tenancy at will [United] cannot prove the element of this claim that the communication was without justification. Based on [Drummond's] tenancy at will, it was justified as a matter of law. Summary judgment is granted in favor of [Drummond] and against the defendant United Land on counts 1, 2, 4, 5, 6, 9, 10, 11, and 12 of the counterclaim. Counts 3 and 7 are moot. Summary judgment is denied as to count 8.
 "As to [Drummond's] complaint, the court grants partial summary judgment in [Drummond's] favor as to count one (1) of its complaint as regards the land leased to TRI under the 2001 lease. There are disputed factual issues as to damages due [Drummond]. The court grants summary judgment to [United] for any damages arising after October 18, 2002, when [Drummond's] tenancy at will was terminated.
 "As to count two (2) summary judgment is granted to [Drummond] as it relates to any damages up to 10/18/02.
 "As to count three (3) of the complaint, summary judgment is granted in favor of the defendants other than United *Page 770 
Land and TRI. No claim is brought against TRI or United Land under count three (3).
 "As to count four (4) summary judgment is granted in favor of all defendants.
 "As to count five (5) summary judgment is granted in favor of all defendants except TRI.
 "As to count six (6) summary judgment is granted as to all defendants except defendant United Land, and is granted in favor of defendant United Land on all claims except as the claim relates to the 2001 lease to TRI, and up to 10/18/02.
 "Defendant United Land has also filed a counterclaim against [Drummond] for a declaratory judgment, and injunctive relief as to the lands subject to the Flat Top lease where [Drummond's] dragline is located. This case was tried non-jury. Counterclaimant United Land is entitled to prevail on the counterclaim, and the court declares that [Drummond's] right to mine the Flat Top property ceased on 10/18/02.
 "[Drummond] is ordered to immediately begin removal of their chattels from that property. The court recognizes that the process is going to be a lengthy, and time-consuming process, and [Drummond] is given 6 months from the date of this order to complete the process.
 "1 The fraud count is not [pleaded] with specificity as to when the misrepresentation[s] were made, to whom they were made, and specificity [as to] what was said. Further, as to the Flat Top lease this claim conflicts with paragraph 24 of the counterclaim. The plaintiff would be entitled to have the count dismissed for failure to state a claim or plead fraud with specificity."
 The Trial
On April 4, 2005, this cause was tried. At that time, the parties expressed confusion as to the impact of the summary-judgment order on the claims and counterclaims allowed to go to trial. Before the jury was empaneled, the trial court clarified that Drummond would be allowed to proceed with its breach-of-contract claims asserted against United and Walter, its fraud claims against United, and its trespass and conversion claims against TRI.
Drummond then voluntarily dismissed its breach-of-contract claim against JWR with leave to reinstate those claims if the trial court's earlier rulings were reversed on appeal.[19] Drummond also expressed surprise that Walter remained a defendant on the breach-of-contract claims. Drummond asserted that it had interpreted the summary-judgment order as granting Walter's motion for a summary judgment on the breach-of-contract claims. Drummond indicated that, because of its interpretation of the summary-judgment order, it had not prepared a case against Walter for trial.
The trial court indicated that its summary-judgment order did not address Walter specifically and that, therefore, Walter remained a defendant as to the breach-of-contract claims. The trial court also indicated that, to prevail against Walter, Drummond had to establish an alter ego theory. However, Drummond subsequently obtained, over Walter's objection, the *Page 771 
trial court's agreement that Drummond could "dismiss [Walter] without prejudice with leave to reinstate if on appeal . . . the appellate court reversed this court and some of those claims that would be viable on their behalf — or against them — are reinstated."
The trial court also clarified that, because Drummond remained on United's properties as a tenant at will after the leases expired, and because the tenancy at will emanated from the expired leases, Drummond's claims could be based only on those properties made the basis of the original leases, as amended by the parties, and not on all of United's coal-bearing lands located in the Warrior Coal Basin. Over Drummond's objection, the trial court stated that only a portion of the Carter Mine property — that property covered by the United-TRI lease — was subject to Drummond's tenancy at will.[20]
Also, because of the trial court's rulings, United was allowed to proceed to trial on only its fraud counterclaim. TRI voluntarily dismissed its counterclaims against Drummond.
Drummond presented its evidence, and, at the close of Drummond's case-in-chief, United and TRI moved for judgments as a matter of law. Walter also moved for a judgment as a matter of law, arguing that Drummond had failed to establish an alter ego theory against it.[21] The trial court granted these motions as to all claims except the breach-of-contract claims asserted by Drummond against United.
On Drummond's breach-of-contract claims, the trial court entered a judgment as a matter of law in favor of Drummond, finding that, as a matter of law, United had breached the terms of Drummond's tenancy at will by entering into the lease with TRI in January 2001. The trial court held that Drummond was entitled to seek damages resulting from those portions of the Carter Mine lease that had been the subject of Drummond's tenancy at will,[22] but only for that period from January 2001 — the date United and TRI entered into that lease — until October 2002 — the date United sent written notice of termination to Drummond. However, because the evidence established that TRI had not mined any coal from the property subject to Drummond's tenancy at will, the trial court held that Drummond could not establish any damages as a result of that breach. For this reason, the trial court ruled that Drummond was entitled to recover only nominal damages. The amount of nominal damages to be awarded Drummond on its breach-of-contract claims was submitted to the jury.
United then presented its fraud counterclaim to the jury; in this claim, United alleged that Drummond had deceived *Page 772 
United and had thereby induced it to enter into the override agreements. At trial, the parties as well as the trial court had difficulty framing the specifics of this fraud claim, in light of the trial court's earlier summary-judgment order. After much debate, the trial court concluded that United had a viable fraud claim only for "deceit," asserted pursuant to § 6-5-103, Ala. Code 1975. The trial court characterized this claim as asserting that Drummond had failed to disclose that it had no foreseeable plan to mine the properties made the subject of the override agreements. The trial court reasoned that if the jury found that Drummond's nondisclosure had been coupled with an intent to deceive, Drummond could be liable for deceit and resulting damages.
At the close of United's case, Drummond moved for a judgment as a matter of law on United's fraud counterclaim. The trial court denied this motion, and United's fraud counterclaim was submitted to the jury.
On April 7, 2005, the jury returned its verdict, awarding nominal damages of $10 to Drummond on its breach-of-contract claims. The jury also returned a verdict in favor of Drummond on United's fraud counterclaim.
 Posttrial Motions and Hearings and Notices of Appeal
On April 11, 2005, Drummond filed its notice of appeal challenging (1) the summary judgment entered by the trial court in favor of United; (2) the injunctive aspect of the trial court's order, which required Drummond to remove its chattels from United's property; (3) the trial court's finding that United had breached Drummond's tenancy at will only as to those parts of TRI's lease for the Carter Mine property that overlapped the property covered by the Kellerman lease; (4) that portion of the trial court's order, entered at the conclusion of Drummond's case-in-chief, entering a judgment as a matter of law for TRI on the trespass and conversion claims; and (5) the award of nominal damages to Drummond.
On April 11, 2005, Drummond moved the trial court to suspend that portion of the summary-judgment order that required Drummond to remove its dragline and other chattels from the Flat Top property within six months. This motion was argued to the trial court on April 26, 2005, and the trial court received ore tenus evidence. On May 10, 2005, the trial court granted Drummond's motion to stay the injunctive aspect of the trial court's March 29, 2005, order. However, the trial court conditioned this stay upon Drummond's posting a $1.25 million bond. Drummond posted the required bond.
On May 16, 2005, United filed its cross-appeal. On May 19, 2005, Drummond filed an amended notice of appeal.
 Issues Presented
In case no. 1041029, Drummond makes the following assertions:
 "1. The trial court erred in ruling that Drummond was a mere tenant-at-will and not the holder of an irrevocable license.
 "2. The trial court erred in ruling as a matter of law that the only rights Drummond had after the expiration of the lease agreements were the rights of a tenant-at-will, ignoring critical extrinsic evidence.
 "3. The trial court erred in ruling as a matter of law that [United, JWR, Walter, and TRI] were not liable to Drummond for trespass, conversion or fraudulent suppression.
 "4. The trial court erred in ruling as a matter of law that Walter Industries and Jim Walter Resources could not be liable to Drummond for breach of contract *Page 773 
or, alternatively, for tortious interference.
 "5. The trial court erred in ruling as a matter of law that TRI could only be liable to Drummond for coal actually mined between January 2001 and October 2002, resulting in a judgment as a matter of law in favor of TRI and against Drummond.
 "6. Even though it was not specifically addressed by the trial court, this Court should not uphold the ruling of the trial court on two issues raised by [United, JWR, Walter, and TRI]: The irrevocable license vested in Drummond is void because it violates the Rule Against Perpetuities or because that interest was forfeited or abandoned and such could be determined against Drummond as a matter of law.
 "7. The trial court erred in ordering Drummond to remove the dragline from the Flat Top area."
(Drummond's brief in case no. 1041029 at ii-iii.)
In its cross-appeal, case no. 1041221, United asserts that all of its counterclaims should have gone to a jury for the following reasons:
 "A. Drummond was not entitled to summary judgment on any of United's counterclaims, because it did not file a proper summary judgment motion.
 "B. The trial court erred in dismissing United's counterclaim for breach of the Beltona, Kellerman, and Flat Top Leases, because the obligations of those leases should have continued for as long as Drummond remained a tenant at will.
 "C. The trial court erred in dismissing United's counterclaim for fraudulent misrepresentation in connection with the Beltona, Kellerman, and Flat Top leases."
(Brief of United in case no. 1041029 at v; see also United's reply brief in case no. 1041221 at I.)
 Standard of Review
We review a summary judgment de novo. Hollingsworth v. Cityof Rainbow City, 826 So.2d 787, 789 (Ala. 2001). We also review a judgment as a matter of law de novo. State FarmMut. Auto. Ins. Co. v. Alexander, 950 So.2d 267 (Ala. 2006). Further, we review de novo the issuance of a permanent injunction. TFT, Inc. v. Warning Sys., Inc.,751 So.2d 1238 (Ala. 1999).
 Drummond's Appeal — Case no. 1041029
Drummond first challenges the trial court's determination that Drummond remained on United's properties as a tenant at will rather than as a holder of an irrevocable license. In reaching this determination, the trial court concluded that, other than as to the four original leases, Drummond and United's agreements failed for indefiniteness or were unexecuted options and therefore were ineffective to extend the terms of the original leases. The trial court reasoned that, once the four original leases expired and Drummond, with United's consent, remained on United's properties, the relationship between Drummond and United became a tenancy at will.
However, Drummond argues:
 "The 1972 Agreement gave Drummond property rights to the surface mineable coal; it was not a right to lease. U.S. Pipe sold Drummond the right to strippable coal in exchange for Drummond's right to the underground coal leases. Consideration was given, and received, by both parties to the 1972 Agreement. The word `option' was not utilized in the 1972 Agreement.
 "In addition to enabling U.S. Pipe to open its No. 4 underground mine, Drummond's *Page 774 
mining under the 1972 Agreement created vast royalties for United Land and its predecessor companies. United Land, and its predecessor companies, undeniably reaped great benefits from this Agreement. Drummond paid United Land millions of dollars in royalties from the surface mining operations.
 "Drummond was able to mine the coal in the Kellerman, Flat Top, and Beltona areas, after the expiration of the prior leases, under the 1972 Agreement by expending vast sums for exploration, capital investments, and operating costs. It is undeniable and uncontested that Drummond invested millions of dollars in its operations on United Land properties. Both parties derived benefits from the mining of the coal under the 1972 Agreement."
(Drummond's brief at 11-12.) In sum, Drummond argues that the 1972 agreement, coupled with the 1991 agreement and the actions of the parties, created an irrevocable license in favor of Drummond.
The starting point for our review of this issue is an examination of the express language of the agreements between Drummond and United. We must construe and interpret the parties' agreements as written. A contract cannot be formed without an offer, an acceptance, consideration, and mutual assent to those terms essential to the contract. Ex parte Payne,741 So.2d 398 (Ala. 1999). Although the destruction of contracts because of uncertainty is disfavored under the law, if a court cannot discern the intentions of the parties to a contract because the contract is so vague and indefinite, the contract is void on the ground of uncertainty. Southern United Fire Ins.Co. v. Knight, 736 So.2d 582, 585 (Ala. 1999).
We first note that the parties do not dispute the validity of the four original leases. Thus, at a minimum, beginning October 1, 1967, the commencement date of the earliest lease (the Beltona lease), Drummond and United were operating under the terms found in United's standard lease form. The latest effective date of any of those original leases, by their express terms, was October 31, 1984, the ending date of the latest lease (the Flat Top lease).
We next review the express language of the 1972 agreement. Specifically, the trial court concluded that the will-extend and will-lease clauses of the 1972 agreement were too indefinite to be enforceable and that, as a result, the 1972 agreement had no effect on the expiration dates of the four original leases. Therefore, we determine the impact of the will-extend and will-lease clauses found in that agreement on the business relationship existing between Drummond and United in 1972.
In the will-extend clause, Drummond and United agreed that "[United] will extend the terms of [the original] leases presently held by Drummond to the extent necessary to complete mining the strippable coal." A "date certain" — the beginning date and the ending date during which an agreement is to be effective — is an essential term of a contract.Industrial Mach., Inc. v. Creative Displays, Inc.,344 So.2d 743 (Ala. 1977). However, the will-extend clause does not provide a date certain. The time required "to complete mining the strippable coal" is unknown. Nothing in the 1972 agreement or in any of the four original leases supplies this missing information. Therefore, the will-extend clause is too indefinite to be enforceable.
In the will-lease clause, Drummond and United agreed that United "will lease to Drummond the right to strip-mine [United's] remaining strippable coal within the Warrior Coal Basin." Again, the parties *Page 775 
did not specify effective dates or termination dates for the leases they anticipated executing. Thus, the will-lease clause, without further action, could not have any effect on the relationship between Drummond and United. As with the will-extend clause, nothing in the four original leases supplies this missing information; therefore, the will-lease clause was inoperative without further action by the parties.
Thus, we agree with the trial court that the will-extend and the will-lease clauses of the 1972 agreement lacked a date certain and therefore did not work to extend the term of the four original leases. We also agree with the trial court that the case of Linton Coal Co. v. South Central Resources,Inc., 590 So.2d 911 (Ala. 1991), is dispositive on the issue whether those clauses are void for indefiniteness. Because of the similarities between the instant case and Linton CoalCo., we discuss Linton Coal Co. in detail.
In Linton Coal Co., the parties entered into a coal-mining lease that provided that the lease would continue in effect "so long as there is recoverable coal remaining in the lands leased hereby." 590 So.2d at 911. Some 13 years after the agreement had been executed, a dispute arose as to the minimum royalties due under the agreement. The lessor, Linton Coal Company, declared the lease suspended until the lessee, South Central Resources, paid the royalties Linton claimed were due. Although South Central Resources later remitted the royalties arrearage, Linton refused to accept the payment and refused to allow South Central Resources to mine the property.
South Central Resources sued Linton, seeking specific performance of the lease, requesting a declaratory judgment concerning the enforceability of the lease, and seeking damages for fraud. Linton answered the complaint and asserted that because the term of the lease was unspecified, the lease was too indefinite to be enforceable.
The trial court rejected Linton's argument, holding that Linton was estopped from relying on the indefiniteness of the lease because Linton had accepted over $192,000 in minimum royalty payments and had allowed the lease to run for approximately 13 years without terminating it, even though very little mining had been done. Linton appealed and again asserted that the lease was void because it did not contain the essential element of a "term certain" — a definite ending date.
On appeal, this Court agreed with Linton and reversed the trial court's judgment. The Court stated that the term of the lease was so incapable of ascertainment that it rendered the lease void as anything other than a tenancy at will. 590 So.2d at 912. As authority for that argument, the Linton Court citedWomack v. Hyche, 503 So.2d 832 (Ala. 1987), for the following principle:
 "`"[I]t is not the certainty of the happening of the event (which is to end the term) but the certainty of the date on which the termination of the lease will take place that is the determinative factor."`"
590 So.2d at 912 (quoting Womack v. Hyche,503 So.2d 832, 834 (Ala. 1987), quoting in turn National Bellas Hess,Inc. v. Kalis, 191 F.2d 739, 740-41 (8th Cir.1951)). For these reasons, the Court in Linton Coal Co. reversed the trial court's judgment and held that the lease was void for indefiniteness, that the parties were operating under only a tenancy at will, and that Linton had validly terminated the tenancy. See also Industrial Machinery, 344 So.2d at 745
(where lease failed to state a definite ending date, an estate at will resulted). *Page 776 
In this case, as in Linton Coal Co., the will-extend and will-lease clauses of the 1972 agreement have no definite end date. From a reading of the 1972 agreement, it is impossible to determine when Drummond would have mined all the strippable coal from those properties made the subject of the will-extend clause; it is also impossible to determine from a reading of the will-lease clause the beginning and ending dates of the leases contemplated therein. Therefore, we agree with the trial court's conclusion that the will-extend and will-lease clauses found in the 1972 agreement were void for indefiniteness and had no impact on the lease agreements in effect between Drummond and United.
 The 1972 Agreement Did Not Create an Irrevocable License
At trial and on appeal, Drummond argues that "[t]he 1972 Agreement, coupled with the 1991 Agreement and [the] actions of the parties, created for Drummond a property interest, i.e., a license coupled with an interest — also known as an irrevocable license." (Drummond's brief at 48.) We disagree.
In determining whether Drummond and United intended to create a lease or a license, we look to the intent of the parties and the surrounding circumstances. Jon W. Bruce and James W. Ely, Jr.,The Law of Easements and Licenses § 11:1 (West 2001). We conclude, as did the trial court, that the parties in this case did not intend to create a license.
By the express language of the 1972 agreement, Drummond and United indicated that they intended to extend the existing teases (the will-extend clause) and to enter into newleases (the will-lease clause). They did not state that they intended to extend or to execute license
agreements. We acknowledge that it is the substance of the agreement and not the labels the parties apply to the agreement that control; however, nothing in the substance of the 1972 agreement indicates that a license was ever intended or contemplated. At the time Drummond and United entered into that agreement, Drummond was already mining United's property under a lease arrangement — Drummond was not mining under a license arrangement. Nothing in the 1972 agreement indicates that Drummond and United contemplated altering the manner in which they had been doing business. For these reasons, we agree with the trial court that Drummond and United never intended to create a license.
Additionally, we note that Drummond relies on events occurringafter the execution of the 1972 agreement as support for its position that the parties did not intend in that agreement to create a lease. This argument ignores the fact that we must construe the parties' agreements and their impact on the parties' relationship in the order in which the agreements were entered into and in the context existing when the agreements were entered into. When interpreting the 1972 agreement, we cannot reach forward in time to the 1991 or 1996 agreements to supply terms or provisions not stated in the 1972 agreement.
Drummond also challenges the trial court's conclusion that the will-extend and will-lease clauses found in the 1972 agreement created, at most, options in favor of Drummond to extend the terms of the original leases and to enter into new leases with United. In reaching this conclusion, the trial court cited and relied on § 35-4-76(a), Ala. Code 1975.
We agree with the trial court. Although we concluded above that the will-extend and will-lease clauses were too indefinite to create binding obligations, Drummond paid United a consideration in exchange for the rights granted by those *Page 777 
clauses. An option is defined as "a contractual obligation to keep an offer open for a specified period, so that the offeror cannot revoke the offer during that period." Black's LawDictionary 1127 (8th ed.2004). Although the 1972 agreement did not specify the duration of the options created under that agreement, § 35-4-76(a), Ala. Code 1975, supplies this missing information:
 "(a) No option to purchase any interest in land, other than an option limited in favor of a lessee and exercisable at a time not later than the end of the term of a lease or any extension or renewal thereof, or an option to repurchase reserved by the grantor in a deed, shall be valid or enforceable for a period of more than 20 years. If any such option may, by the terms of the instrument creating it, continue to exist for longer than 20 years, it shall terminate and cease to be enforceable 20 years after the time of its creation. Where the instrument creating any such option shall place no limit upon the duration of the option or otherwise state the terms controlling the duration of the option, the option shall cease to be enforceable two years after the time of its creation. This section shall not apply to options created prior to January 31, 1972."
(Emphasis added.) Because the 1972 agreement — the agreement creating these options — placed no limit on the duration of Drummond's right to enter into new leases and placed no limit on the duration of Drummond's right to extend the terms of the original leases, those options are deemed, as a matter of law, to have existed for two years from the date of their creation.
 Drummond and United's Business Relationship After the 1972 Agreement
After Drummond and United executed the 1972 agreement, the four original leases continued in effect. We have concluded above that the express language of the 1972 agreement was insufficient to alter or to impact the termination dates of the four original leases. We also have concluded that the will-extend and will-lease clauses were an unenforceable agreement to agree or, at most, created a two-year option in favor of Drummond to extend the dates of those original leases and a two-year option to enter into leases regarding certain lands owned by United and located in the Warrior Coal Basin.
However, we find nothing to indicate that Drummond ever exercised its will-extend option. After the execution of the 1972 agreement, Drummond and United did not enter into any agreements that can be characterized as supplying the information missing from the 1972 agreement regarding a date certain for the will-extend clause. We recognize that Drummond and United were both operating under the mistaken belief that the 1972 agreement had created an indefinite or open-ended term for those leases and, therefore, that both Drummond and United were unaware of the need to take further action regarding the effective dates of the four original leases. However, as discussed above, the 1972 agreement could not, as a matter of law, work as an indefinite extension of those leases.
We do find evidence indicating that Drummond and United took action that could be construed as effectuating the will-lease option granted to Drummond. After the execution of the 1972 agreement, United granted Drummond the right to surface-mine other properties owned by United in addition to those properties identified in the four original leases. This was effectuated by Drummond and United's executing "modification agreements" to the four original leases. *Page 778 
However, these modification agreements did nothing more than add additional land to the scope of the four original leases; they did not extend the term of those leases or otherwise alter the terms of those leases. Therefore, after the execution of the 1972 agreement, Drummond and United continued operating under the express provisions of the four original leases, as modified, until the stated expiration dates of those leases.
 The Expiration of the Four Original Leases
By their express terms, the four original leases expired as follows: the Cluster Springs lease expired in March 1979; the Beltona lease expired in September 1982; the Kellerman lease expired in May 1983; and the Flat Top lease expired in October 1984. After the expiration of the leases, Drummond and United continued to conduct themselves in accordance with their previously existing contractual relationship. Based on correspondence between, and actions taken by, the parties, it is clear that both Drummond and United believed the 1972 agreement had worked to extend indefinitely the terms of the four original leases. However, as discussed above, that purported extension was ineffective as a matter of law.
Because Drummond and United continued their lessor-lessee relationship after the expiration of the original leases, we must agree with the trial court that Drummond's continued presence on United's properties was as a "tenant at will." SeeLinton Coal Co., 590 So.2d at 912 (holding that the term of the lease was so incapable of ascertainment that it rendered the lease void as anything other than a tenancy at will, which the parties continued for years before that tenancy was terminated); see also Industrial Machinery,344 So.2d at 745 ("Where the end of the term [of a lease] is indefinite and uncertain there is no valid lease for a term of years, but an estate at will is thereby created."). For these reasons, the trial court did not err in concluding that, after the expiration of the four original leases, Drummond continued mining on United's lands as a tenant at will.
 The Impact of the 1991 Agreement
We next analyze the impact of the 1991 agreement on the parties' relationship. We have already concluded that at the time of entering into this agreement, Drummond was remaining on United's property as a tenant at will. Thus, we must construe the impact of the 1991 agreement on the relationship that existed at that time.
The relevant language of the 1991 agreement is as follows:
 "We agree that non-essential areas referred to in a) above be released from the Agreement and revert to United Land. As of the date of this letter, these areas are listed in Appendix I. New leases to be executed are listed in Appendix II.
 "Possible mining tracts which do not fall into the categories listed in either Appendix I or II are listed in Appendix III. It is agreed that from time to time after the date of this letter, not exceeding 12-month intervals, United Land will meet with Drummond to define, by mutual consent, additional non-essential areas which may at this time be included in Appendixes II and III.
 "For surface mining areas to be retained by Drummond, we agree to execute specific new leases under existing terms and conditions, each with a 20-year term, and as long thereafter as lessee diligently pursues the mining of all recoverable coal (see Appendix II). All new leases shall be set out on United Land's lease form as called for in the Agreement. Any lease may be cancelled *Page 779 
by Drummond by the giving of a one-year notice.
 "We agree that the Flat Top Corridor X coal will be mined by JWR with all of the rights as to mining system, timing, markets, etc., being vested in JWR.
 "We agree that United Land/JWR will release certain underground mining lands located in Tuscaloosa County from the terms and conditions of the Agreement (see Appendix IV). Drummond Company will have the right to exploit the coal seams in this area as they deem necessary.
 "United Land agrees to lease to Drummond the right to mine the Nebo coal adjoining their Chetopa Mine for a production royalty of 5-1/2% and all other terms and conditions generally in line with United Land's standard lease form.
 ". . . .
 "5. Documentation
 "To the extent necessary, appropriate amendments to the contracts affected or new agreements required by the foregoing understandings will be prepared and presented to you or your designated representative for approval. The foregoing understandings and any amendments or new contracts necessary are subject to approval, if any, that may be required from The United States Bankruptcy Court, Middle District of Florida, Tampa Division."
After reviewing this language, we must conclude that Drummond and United again failed, as to nearly all of the provisions of the 1991 agreement, to create a binding contract. In nearly every provision of the 1991 agreement, Drummond and United contemplated that additional documents would be necessary to effectuate the 1991 agreement. In fact, in the 1991 agreement, Drummond and United specifically stated: "`To the extent necessary, appropriate amendments to the contracts affected or new agreements required by the foregoing understandings will be prepared. . . ." Thus, Drummond and United specifically recognized that additional actions were required to effectuate at least some of their goals, thereby creating an "agreement to agree" as to many aspects of the 1991 agreement.
This Court has recognized that, in order to be enforceable, a contract to enter into a future contract must be definite and certain in all of its terms and conditions so that the court can ascertain what the parties have agreed upon. Mobil Oil Corp.v. Schlumberger, 598 So.2d 1341 (Ala. 1992); MuscleShoals Aviation, Inc. v. Muscle Shoals Airport Auth.,508 So.2d 225 (Ala. 1987). The 1991 agreement did not provide definite and certain terms. Therefore, as to those matters for which Drummond and United did not take their anticipated future actions, the 1991 agreement did not alter the parties' existing relationship, i.e., the tenancy at will. Because Drummond and United did not take additional action to extend the terms of the four original leases, we agree with the trial court that the 1991 agreement had no impact on the tenancy at will existing between Drummond and United at the time the 1991 agreement was executed.
 The Impact of the 1996 Agreement
We next review the trial court's determination regarding the 1996 agreement. The relevant language of the 1996 agreement was as follows:
 "1. The properties set forth in exhibits A and B were added to the Tuscaloosa County (1972) agreement.
 "2. The Tuscaloosa County agreement [the 1972 agreement] shall be and remain in full force and effect according to all the terms, conditions, and covenants as hereby modified and amended." *Page 780 
In construing this language on the parties' motions for summary judgment, the trial court stated:
 "Based on the court[s] above legal conclusions, the only legal effect this document could have, would be to grant a new two (2) year option to the plaintiff to lease the defendant's lands. The tenancy at will as to the four (4) expired leases would remain in effect, until and unless, new leases were executed."
We find no error in the trial court's reasoning. The agreement between Drummond and United to continue the 1972 agreement in full force and effect could continue only the relationship, if any, the 1972 agreement had put into place. We have concluded that this relationship was a tenancy at will. For these reasons, we agree with the trial court that, as a matter of law, the 1996 agreement did not alter the tenancy at will that existed between Drummond and United at the time they entered into the 1996 agreement.
Whether the 1972, 1991, and 1996 Agreements Were Ambiguous, Thereby Allowing Extrinsic Evidence to Interpret Them
Drummond argues that the trial court should have allowed extrinsic evidence of the parties' interpretation of their agreements and evidence of their course of dealing to establish the meaning of those agreements. We disagree.
Drummond and United's intent is clear from the four corners of the 1972, 1991, and 1996 agreements. The parties intended to extend indefinitely the terms of the four original leases. Thus, there is nothing ambiguous about those agreements or about the parties' intent as expressed in those agreements.
Because the agreements were not ambiguous, the trial court properly excluded extrinsic evidence to explain or to supplement the express language of those agreements. See SouthlandQuality Homes, Inc. v. Williams, 781 So.2d 949 (Ala. 2000) (recognizing that the primary source for determining whether a contract is clear is the text of the document itself; when an instrument is unambiguous its construction and legal effect will be based upon what is found within its four corners). General contract law requires a court to enforce, as it is written, an unambiguous and lawful contract. Ex parte University ofSouth Alabama, 812 So.2d 341 (Ala. 2001). A document is unambiguous only if one reasonable meaning emerges from a reading of the document. Wayne J. Griffin Elec., Inc. v.Dunn Constr. Co., 622 So.2d 314 (Ala. 1993). Therefore, the trial court properly concluded that extrinsic evidence was inadmissible to vary or explain the agreements.
 The Time Limitations Placed by the Trial Court on Drummond's Claims
As a result of its ruling that the relationship between Drummond and United was a tenancy at will, the trial court concluded that the only time period relevant to Drummond's claims was that period from January 2001 until October 2002. The trial court reasoned that until United leased the Carter Mine property to TRI in 2001, Drummond's rights under the tenancy at will remained unfettered; the trial court also reasoned that once United notified Drummond in October 2002 of Drummond's alleged breaches of the agreements and terminated any leases then remaining in effect, Drummond no longer held a protectible interest in any of United's lands.
This ruling impacts the issues raised on appeal in numerous ways — it impacts the correct analysis of every claim asserted by Drummond — and Drummond challenges that ruling on appeal. United also challenges *Page 781 
this ruling in its cross-appeal, asserting that Drummond's tenancy at will was terminated when United leased the property to TRI in January 2001. As a result, United argues that Drummond's breach-of-contract claims should not have gone to the jury. (See United's brief at 56.)
Because we agree that Drummond held a tenancy at will by implication, rather than a tenancy at will by express agreement, we note that the statutory 10-day termination-notice provision, found in § 35-9-3, Ala. Code 1975, is inapplicable in this case. See Womack v. Hyche, 503 So.2d 832, 836-37
(Ala. 1987) ("Alabama Code 1975, § 35-9-3, requires either party to a tenancy at will, in order to terminate the tenancy, to give 10 days' notice in writing to the other party. This, however, applies only to tenancies which are expressly
tenancies at will, which is not the case here."). Because Drummond's tenancy at will was not expressly created but was created "by implication," i.e., as a result of judicial interpretation, United was not obligated to provide the statutory 10-day notice before it could terminate Drummond's tenancy at will.
We also note that Alabama caselaw contains varied statements of what constitutes proper notice to terminate a tenancy at will by implication. In Womack v. Hyche, supra, a lessor instituted a declaratory-judgment action seeking to have a lease declared void. The lease agreement in issue there purported to grant the tenant the right to renew the lease "as long as the [commercial fishing] camp is run as a business for a profit."503 So.2d at 833. Because this renewal provision created an uncertain ending date for the lease, this Court held that the agreement lacked a date certain and resulted in a tenancy at will. 503 So.2d at 837.
In addressing the termination of the lease, this Court recognized that when a tenancy at will resulted by implication, the lessee was not entitled to the statutorily required 10-day notice but was entitled to "reasonable notice to quit the premises." 503 So.2d at 837. The lessor in Womack had instituted the declaratory-judgment action for the purpose of terminating the tenancy; this Court recognized that that legal action was sufficient notice to the lessee. This Court remanded the case to the trial court for the entry of an order requiring the lessee to vacate the leased premises within a reasonable time. 503 So.2d at 837.
However, in Brown v. Williams, 576 So.2d 195
(Ala. 1991), this Court stated that "the general rule is that, in the absence of an agreement between the parties, a month's notice prior to the end of the leasehold period, when that period is a month or more, is adequate." 576 So.2d at 197
(citing Restatement (Second) of Property, Landlord and Tenant § 1.5(f)).
However, in Industrial Machinery, this Court stated:
 "`[T]he rule generally followed in this country is that a tenancy at will is terminated by a conveyance of the premises by the landlord. . . .' 49 Am.Jur.2d Landlord and Tenant § 79; accord, Annot., 120 A.L.R. 1006 (1939). We opine also that notice to [the tenant] to terminate was not required. Ten days['] notice is required under Title 31, § 3 of the Code of Alabama 1940 [now § 35-9-3, Ala. Code 1975] only when the tenancy at will is expressly created."
344 So.2d at 745. See also 2 Richard R. Powell Michael A. Wolf, Powell on Real Property § 16.05 (2000) ("any lease or conveyance of the affected property to a third party made by the landlord ends the tenancy at will"). *Page 782 
Relying on Industrial Machinery, United argues that its January 2001 lease to TRI was sufficient to terminate Drummond's tenancy at will. We decline to follow this approach here.
Based on the parties' earlier course of dealing, Drummond could reasonably have interpreted United's lease to TRI as something other than a termination of the lessor-lessee relationship between it and United. United had previously leased its property to third parties and, upon Drummond's asserting a superior claim to the coal on that property, United had agreed to pay Drummond an override royalty in exchange for Drummond's release of its rights. Thus, when Drummond learned of the 2001 United-TRI lease, Drummond could have reasonably expected the same sequence of events to occur. It was not until October 2002 — when United expressly terminated any remaining lease agreements with Drummond — that Drummond was unquestionably on notice of United's position regarding the leases. Thus, we disagree with United that it terminated Drummond's tenancy at will in January 2001. We agree with the trial court that United did not terminate Drummond's tenancy at will until October 2002. For that reason, we agree with the time limitations placed by the trial court on Drummond's claims.
We now review the parties' specific claims, as ruled upon by the trial court, in light of the above conclusions.
 Drummond's Claims Alleging Trespass, Conversion, and Fraudulent Suppression
In its complaint, as finally amended, Drummond alleged, among other things, trespass to property rights (Count IV); conversion of coal to which Drummond claimed a superior right (Count V); and fraudulent suppression of the fact that United had entered into the lease with TRI (Count VI). At the close of Drummond's case-in-chief, the trial court entered a judgment as a matter of law in favor of TRI on Drummond's trespass and conversion claims. The trial court also entered a judgment as a matter of law for United on Drummond's fraud claim. Drummond alleges that the trial court erred in doing so.
We first address Drummond's trespass claim. "Our law on trespass is plain that the gist of any trespass action is the interference with a right to possession of property. Absent such right of possession, there can be no action based on trespass."Avery v. Geneva County, 567 So.2d 282, 289 (Ala. 1990). The evidence at trial established that TRI did not mine coal on any portion of United's property that was subject to Drummond's tenancy at will. The evidence established that TRI mined only on those portions of the Carter Mine property that were not within the scope of Drummond's rights. For that reason, the trial court concluded that TRI could not have trespassed to Drummond's rights to the coal as a matter of law.
As noted above, we agree with the trial court's ruling that once the four original leases expired Drummond remained on United's property as a tenant at will. In light of that and in light of the evidence established at the trial, we agree that TRI could not have trespassed on Drummond's rights — if TRI did not mine any coal from lands subject to Drummond's tenancy at will, TRI could not have trespassed on Drummond's right to such coal. We affirm the judgment as a matter of law in favor of TRI.
We next address Drummond's conversion claim. As stated above, the evidence established that TRI did not convert any coal from those lands subject to Drummond's tenancy at will. TRI could not *Page 783 
have converted any coal to which Drummond had a right if TRI did not mine on property subject to Drummond's rights. Accordingly, we affirm the judgment as a matter of law in favor of TRI on Drummond's conversion claim.
Next, Drummond alleges that the trial court erred in entering a judgment as a matter of law in favor of United on its fraudulent-suppression claim. In that claim, Drummond alleged that United suppressed the existence of the lease between it and TRI. The trial court entered a judgment, as a matter of law in favor of United on this claim, although it did not state specific reasons for doing so.
The tort of fraudulent suppression is defined at § 6-5-102, Ala. Code 1975:
 "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
In State Farm, Fire Casualty Co. v. Owen,729 So.2d 834 (Ala. 1998), this Court recognized that in order to establish a fraudulent-suppression claim, a plaintiff must show:
 "(1) [T]hat [the defendants] had a duty to disclose an existing material fact; (2) that [the defendants] suppressed this material fact; (3) that [the defendants'] suppression of this fact induced [the plaintiff] to act or to refrain from acting; and (4) that [the plaintiff] suffered actual damage as a proximate result."
729 So.2d at 837.
During its case-in-chief, Drummond failed to establish the essential elements of its fraud claim. Drummond failed to present evidence indicating that it relied on the alleged suppressed fact in any way or that it was induced to act or to refrain from acting as a result of the alleged suppressed fact. As noted above, Drummond was not mining on United's property at the time United entered into the lease with TRI. Additionally, no evidence was presented to indicate that Drummond was attempting or was even planning to mine United's property at the time United entered into the lease with TRI. Without evidence of reliance, Drummond cannot establish the essential elements of its fraudulent-suppression claim. The trial court properly entered a judgment as a matter of law on this claim.
Drummond's Claims Against Walter and JWR Alleging Breach of Contract or, Alternatively, Tortious Interference with Business Relations
Drummond also appeals from the judgments entered in favor of Walter and JWR on Drummond's breach-of-contract claims and on Drummond's claims of tortious interference.[23] On appeal, Drummond bases its breach-of-contract claim against Walter on two theories: (1) that Walter remained liable under the 1972 and the 1991 agreements; *Page 784 
and (2) that Walter, the parent corporation of United, acted as the "alter ego" of United, directed United to take the actions it did, and therefore was liable for United's breach of its agreement with Drummond. Drummond bases its breach-of-contract claim against JWR on direct liability only because JWR was a signatory to the 1991 agreement. (Drummond's brief in case no. 1041221/reply brief in case no. 1041029 at 27.)
We agree with Drummond that the manner in which its breach-of-contract claims against Walter and JWR were handled in the trial court was confusing. However, because of our determination on the tenancy-at-will issue, we conclude that Drummond's contractual rights to United's coal arose out of the four original leases only. Thus, in order to establish liability against Walter or JWR for breach of contract, Drummond must establish that Walter or JWR had liability on the four original leases.
However, Drummond has not asserted that Walter or JWR were parties to the four original leases; Drummond also has not asserted on appeal that Walter or JWR were or should be considered parties to the tenancy at will. Drummond asserts only that Walter and JWR are subject to liability on the 1972 and 1991 agreements.
Because we have concluded that the 1972 and 1991 agreements were void for indefiniteness or, at best, that they were unexecuted agreements to agree, the 1972 and 1991 agreements created no obligations that United or anyone else could have breached. For this reason, we need not address Drummond's breach-of-contract claims against Walter or JWR.[24]
Drummond also appeals from the dismissal of its tortious interference claim asserted against Walter and JWR. In its summary-judgment order, the trial court stated:
 "Count three (3) of the complaint involves party defendants other than defendant United Land and TRI. This count claims that defendants Walter Industries, and JWR intentionally interfered with rights [Drummond] had under the 1972 and 1991 agreements. Applying the legal findings of this [court], [Drummond's] only rights arose out of the hold over tenancy after the leases expired. Therefore, these defendants are entitled to judgment as a matter of law, since [Drummond] had no remaining rights under the 1972 and 1991 agreements at the time suit was filed."
We note that in its claim of tortious interference, Drummond alleged that Walter and JWR interfered with Drummond's business relations arising out of the 1972 and the 1991 agreements. However, the trial court held, and we agree, that the 1972 and 1991 agreements were ineffective to create a contractual or business relationship with Drummond and United. Without evidence indicating that the 1972 or 1991 agreement was effective and binding, Drummond cannot prove that anyone wrongfully interfered with the purported relationship.
However, we also note that the trial court held, and we agree, that Drummond *Page 785 
and United had an ongoing business relationship — a tenancy at will that flowed from the expired original leases. A tenancy at will is a sufficient business or property interest to support a claim of tortious interference under the proper circumstances. See, e.g., Hall v. Integon Life Ins. Co.,454 So.2d 1338, 1344 (Ala. 1984) (recognizing that wrongful or malicious interference with at-will employment contract may give rise to a tortious interference claim; "the fact that the employment is at the will of the employer and the employee does not make it one at the will of third parties").
However, those proper circumstances are not present in this case. Drummond did not argue at trial that Walter and JWR tortiously interfered with its tenancy at will. We recognize that, at the time the trial court entered the summary judgment on the tortious-interference claim, Drummond was alleging that the 1972 agreement and the 1991 agreement were effective and that Walter and JWR had wrongfully interfered with the contractual relationship arising out of those agreements. However, after the trial court recognized that the only relationship existing between Drummond and United was that of a tenant at will, Drummond still did not assert, either exclusively or alternatively, that Walter and JWR had interfered with its tenancy-at-will relationship. In other words, Drummond did not attempt to restate its tortious interference claim to conform to the trial court's summary-judgment order, which it could have done.
Additionally, on appeal, Drummond does not assert this theory either exclusively or alternatively; Drummond continues to argue that Walter and JWR interfered only with the contractual relationship arising out of the 1972 and 1991 agreements. However, we have agreed with the trial court that the only relationship in existence between Drummond and United as of the expiration of the four original leases was that of a tenant at will. Because Drummond has not asserted that Walter and JWR interfered with the only business relationship in existence between Drummond and United, Drummond's allegations will not support a tortious-interference claim against Walter or JWR. We must affirm the trial court's summary judgment on this issue.
Drummond's Claim that the Trial Court Erred in Ordering Drummond to Remove the Dragline from the Flat Top Property
We have concluded that Drummond remained on United's property under a tenancy at will. Upon termination of the tenancy at will, Drummond had no further rights in United's properties. As Drummond correctly stated in its brief filed with this Court: "If Drummond has no interest [in the property], then, of course, it has to move the dragline." (Drummond's brief at 118.) Because Drummond no longer has a right to remain on United's properties, Drummond no longer has a right to leave its personal property on the Flat Top property. For this reason, the trial court properly ordered Drummond to remove its chattels from the property that was made the subject of the Flat Top lease. We affirm the order of the trial court issuing the permanent injunction ordering Drummond to remove its chattels.
United's Cross-Appeal — Case no. 1041221
United first asserts that the trial court erred in considering Drummond's summary-judgment motion. United asserts that Drummond failed to submit a narrative statement of undisputed facts in its summary-judgment motion and, therefore, that Drummond's motion failed to comply with Rule 56, Ala. R. Civ. P. For this reason, United argues that Drummond's *Page 786 
motion should have been treated as a nullity.[25]
After reviewing Drummond's "Motion for Partial Summary Judgment," we disagree with United. Although Drummond did not include a separate heading and a separate section for its statement of the facts, and although we agree with United that the motion could have been presented in a more organized fashion, the facts Drummond considered to be relevant to its motion for a summary judgment are apparent therein. The Committee Comments on the 1973 Adoption of Rule 56, Ala. R. Civ. P., provide:
 "`Summary judgment procedure is not a catch-penny contrivance to take unwary litigants into its toils and deprive them of trial, it is a liberal measure, liberally designed for arriving at the truth. Its purpose is not to cut litigants off from their right of trial by jury if they really have evidence which they will offer on a trial, it is to carefully test this out, in advance of trial by inquiring and determining whether such evidence exists.'"
(Quoting Whitaker v. Coleman, 115 F.2d 305, 307 (5th Cir.1940).) Because those facts that Drummond contended were supportive of its motion were made apparent in the motion, we conclude that its motion complied with the requirements of Rule 56, Ala. R. Civ. P., although we caution that the better practice is for a party to state its narrative summary of undisputed facts separately from its arguments. The trial court did not err to reversal in considering Drummond's summary-judgment motion.
United next argues that the trial court erred in dismissing its counterclaims alleging breach of the Beltona, Kellerman, and Flat Top leases. On appeal, United argues that "[a]s a tenant at will . . . Drummond should have continued to bear the obligations that it bore under the expired leases from which those tenancies emanated." (United's brief at 68.)
We must agree with United. If Drummond's right to remain on United's properties was governed by the terms of the expired leases, and we have held that it was, Drummond's obligations to United also continued to be governed by the terms of those expired leases. Whether the parties' agreements created formal lease agreements or tenancies at will, their relationship was governed by the terms stated in the four original leases.
Therefore, United should have been allowed to proceed with its claims that Drummond breached the terms of those leases, including, among others, that Drummond failed to pay minimum royalties (if required under the terms of the expired leases); that Drummond failed to continuously mine (if required under the terms of the expired leases); and that Drummond failed to provide documentation of its mining plans (if required under the terms of the expired leases). We express no opinion on the merits of United's breach-of-contract claim; we simply conclude that the trial court improperly dismissed this claim.
The trial court erred in dismissing United's claim for breach of the tenancy at will. We reverse this aspect of the trial court's summary judgment and remand the case for further proceedings as to that aspect consistent with this opinion.
United next argues that the trial court erred in entering a summary judgment on its counterclaim alleging fraudulent misrepresentation in connection with the Beltona, Kellerman, and Flat Top leases (Count II of United's counterclaims). In its final form, United phrased this claim as follows: *Page 787 
 "42. Pursuant to the 1972 Agreement, United Land extended the term of each of the Beltona, Kellerman, and Flat Top Leases to such term as would enable Drummond to remove all the strippable coal from the lands described in the Leases.
 "43. Drummond continued mining under the leases for many years past the originally scheduled expiration dates of each Lease and then voluntarily ceased mining on such lands.
 "44. Drummond intentionally represented, and intended that United would rely on such representations, that it had removed all strippable coal from the lands described in each of the Leases which representations were false.
 "45. United Land reasonably relied on such representations and did not exercise its rights under the Leases and under the law because of Drummond's misrepresentations.
 "46. United Land has suffered substantial damages by relying on such misrepresentations, including loss of royalty income, litigation expenses, and otherwise, because of Drummond's intentional misrepresentations made with malice.
 "47. WHEREFORE, United Land claims compensatory damages in the amount determined reasonable and appropriate by the jury, along with punitive damages as a multiple of the compensatory award as deemed appropriate by the jury."
As to this claim, the trial court stated in its summary judgment:
 "Count two (2) claims fraudulent misrepresentations regarding the Beltona, Kellerman, and Flat Top leases. These leases having expired in the 1980's, and before the misrepresentations were allegedly made, plaintiff is entitled to judgment as matter of law."
This statement — "[t]hese leases having expired in the 1980's, and before the misrepresentations were allegedly made, plaintiff is entitled to judgment as matter of law" contradicts the findings of the trial court, and the conclusion of this Court, that Drummond and United continued their business relationship under a tenancy at will, which emanated from the four original leases. Because Drummond and United's relationship continued intact past the expiration of the four original leases, Drummond could have made a misrepresentation as to the completeness of its mining activities at the Flat Top property, as alleged by United. Therefore, we do not understand the trial court's reasoning as expressed in this statement, and we do not understand the application of this statement to the issue at hand.
However, the trial court also indicated in its summary judgment that Drummond was entitled to a summary judgment on this claim for another reason:
 "The fraud count is not plead[ed] with specificity as to when the misrepresentation[s] were made, to whom they were made, and specificity [as to] what was said. Further, as to the Flat Top lease this claim conflicts with paragraph 24 of the counterclaim. The plaintiff would be entitled to have the count dismissed for failure to state a claim or plead fraud with specificity."
After reviewing United's allegations and the manner in which this claim was presented to the trial court, we agree with the trial court that the fraud claim asserted in Count II of United's counterclaim was not pleaded with sufficient specificity as to the Beltona lease and the Kellerman lease. As to those two leases, United failed to identify the specific representations on which it based its fraud claim, to whom and by whom those communications were purportedly made, when they were purportedly *Page 788 
made, and in what manner United relied on the purported communications. Such vague allegations do not meet the degree of specificity required to properly plead a fraud claim.
As to the Flat Top lease, United was sufficiently specific in its allegations. In asserting its fraud claim as to the Flat Top property, United relied on correspondence from Drummond. In this correspondence, dated August 1999, Drummond indicated that the coal "inventory [at the Flat Top Mine has been] depleted."[26]
In Count II of its counterclaim, United asserts that it relied on this representation and believed that all the strippable coal had been removed from the Flat Top property. United also asserts that it sustained damage as a result of its reliance on Drummond's representation. Thus, United pleaded this aspect of its fraud claim with sufficient specificity.
We next consider whether we should affirm the trial court's summary judgment on Count II of United's counterclaim based upon the trial court's conclusion that "as to the Flat Top lease this claim conflicts with paragraph 24 of the counterclaim." In paragraph 24 of the counterclaim, United stated:
 "By letter dated May 11, 1998, in response to the request of United Land, Drummond advised that the remaining life of Drummond's Flat Top Mine . . . was not expected to extend beyond June 1999. Drummond admitted that there were coal resources that would be left after but indicated it was impractical for Drummond to mine those."
We compare this paragraph 24 to United's allegations included in Count II of its counterclaim:
 "43. Drummond continued mining under [the Flat Top lease] for many years past the originally scheduled expiration dates . . . and then voluntarily ceased mining on such lands.
 "44. Drummond intentionally represented, and intended that United Land would rely on such representations, that it had removed all strippable coal from the lands described in each of the Leases which representations were false.
 "45. United Land reasonably relied on such representations and did not exercise its rights under [the Flat Top lease] and under the law because of Drummond's misrepresentations."
Based on this comparison, we fail to see any inconsistency in United's allegations regarding the Flat Top property, as stated in Count II of the counterclaim. Therefore, this observation by the trial court does not afford a basis on which to affirm the summary judgment against United.
The elements of a fraud claim are (1) a false representation, (2) of a material existing fact, (3) reasonably relied on by the claimant (4) who suffered damage as a proximate consequence of the misrepresentation. Waddell Reed, Inc. v. UnitedInvestors Life Ins. Co., 875 So.2d 1143 (Ala. 2003). United established evidence tending to show that Drummond represented that it had mined all the strippable coal from the Flat Top property; that Drummond's representation was false; that United relied on that representation; and that United sustained damages as a result of its reliance. The record contains evidence to indicate both that Drummond did, and did not, mine all the strippable coal from the Flat Top property. Thus, a factual dispute as to this issue has been *Page 789 
presented. Accordingly, as to the Flat Top property, the trial court improperly entered a judgment in favor of Drummond.
We conclude that in Count II of its counterclaim United failed to plead its fraud claim with sufficient specificity as to the Beltona and Kellerman leases, and we affirm this aspect of the trial court's summary judgment entered on Count II of United's counterclaim. As to United's allegations in Count II regarding the Flat Top property, the trial court improperly entered a summary judgment in favor of Drummond. We reverse this aspect of the summary judgment.
 Conclusion
In case no. 1041029, we affirm the trial court's summary judgment to the extent that it held that the 1972, 1991, and 1996 agreements were void for indefiniteness or, at most, created an option in favor of Drummond. We also affirm that summary judgment to the extent that it held that Drummond remained on United's property as a tenant at will. We also affirm the judgments entered as a matter of law on Drummond's claims of trespass, conversion, and fraudulent suppression. We affirm the judgment entered as a matter of law as to Walter and JWR on Drummond's claims of breach of contract or, alternatively, tortious interference with business relations. We affirm the judgment entered on the award of nominal damages to Drummond on its breach-of-contract claims against United. We affirm the trial court's order entering an injunction ordering Drummond to remove the dragline and other personal property from the Flat Top property.
In case no. 1040221, we find no error in the trial court's ruling concerning the sufficiency of Drummond's motion for a summary judgment, and we affirm the judgment entered in favor of Drummond on United's claims of fraud as to the Kellerman and Beltona leases. However, we reverse the judgment entered in favor of Drummond as to United's claim of fraud regarding the Flat Top property. We also reverse the trial court's judgment as to United's counterclaim alleging breach of contract. We remand this cause to the trial court for further proceedings consistent with this opinion.
1041029 — AFFIRMED.
1041221 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
NABERS, C.J., and SEE, LYONS, HARWOOD, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
[1] H.E. Drummond Coal Company, Kellerman Mining Company, and Black Creek Coal Sales Agency were among the predecessors in interest to Drummond. United States Pipe and Foundry Company was the predecessor in interest to United; the parties refer to this predecessor entity as "old U.S. Pipe." In this opinion, rather than referring to a predecessor, we refer to Drummond or United, as appropriate, unless a reference to the predecessor is appropriate for clarity.
[2] According to United, new U.S. Pipe and old U.S. Pipe are not the same legal entities. See United's brief at 2. In any event, Drummond conceded at the summary-judgment hearing that U.S. Pipe was entitled to a judgment as a matter of law as to all claims asserted against it. Therefore, we will not hereinafter refer to U.S. Pipe as a defendant, other than as necessary to an understanding of the background or the allegations asserted in this case.
[3] The Kellerman lease is also sometimes referred to as the "Tuscaloosa County agreement." At other points in the record, the parties appear to refer to the 1972 agreement, discussed below, as the Tuscaloosa County agreement.
[4] The Kellerman lease contained another difference that is potentially substantive. In paragraph 1(b), the Kellerman lease provided: "Lessee shall undertake to remove all minable coal as follows: Where the overburden does not exceed eighty (80) feet, provided that Lessee shall not be obligated to mine in areas where by reason of terrain or inherent nature of conditions of the strata the removal of the coal is not economical orpracticable." (Emphasis added.)
A few other terms of the Kellerman, Flat Top, and Cluster Springs leases vary slightly from the terms of the Beltona lease. In paragraph 7, the Kellerman, Flat Top, and Cluster Springs leases include additional language regarding the calculation of the royalty payments. In paragraph 10, the Kellerman, Flat Top, and Cluster Springs leases include additional language regarding "spoil disposal." In paragraph 19, the Kellerman, Flat Top, and Cluster Springs leases contain additional language requiring the lessor to provide written notice to the lessee of any alleged violations of the lease agreements.
[5] According to United's brief, "[t]he Warrior Coal Basin consists of large portions of Tuscaloosa County, Jefferson County, and Walter County, with smaller portion spilling over into adjoining counties."
[6] A senior executive vice president for JWR authored this letter. The letter begins "[b]y this letter, I am confirming the arrangement that you and I have agreed to. . . ." However, the document provided formal signature lines for only United and Drummond.
[7] In the trial court, Drummond asserted that "[t]he domestic and international markets for coal are cyclical. The demand and price for coal rise and fall with the world economy, environmental concerns and governmental regulations, making the economics of mining the largest issue for the coal mining industry. It is not unusual [in the mining industry] to temporarily suspend production and then to resume production as economics dictate."
[8] In the 1996 agreement, Drummond and United listed several agreements they had previously executed; they refer to these agreements collectively as "the Tuscaloosa County agreement." As noted earlier, the parties also sometimes refer to the Kellerman lease as the "Tuscaloosa County agreement."
[9] United's lease with TRI addressed property the parties referred to as the "Panther Mine." The 1997 release executed by Drummond and United referred to property known as the "Panther Creek Property." Based on the manner in which these documents are presented in the record and based on the arguments made regarding these documents, we presume that the term "Panther Creek Property" refers to all or a discrete portion of the "Panther Mine" property.
[10] According to United, a dragline is "a walking, crane-like machine used to remove huge bucketfuls of material during strip-mining." (United's brief at 14.) Drummond represents that the dragline weighs 7.2 million pounds and has a 310-foot boom. Drummond also asserts that "[i]t could cost $2.5 million to disassemble the dragline and another $5 million to store it and reassemble it. It would then take 2 to 3 months of negotiations and then 6 months to actually disassemble it." (Drummond's brief at 41-42.)
[11] These statements are based on inferences from the arguments made to the trial court and to this Court, not on an actual comparison of the property descriptions contained in the Carter Mine lease, the Kellerman lease, and the 1972, 1991, and 1996 agreements. It appears that the parties agree that a portion, but not all, of the Carter Mine property overlaps the property described in the Kellerman lease. However, it also appears that Drummond claimed to have mining rights to all the land covered by the Carter Mine lease by virtue of its 1972, 1991, and 1996 agreements with United.
[12] Drummond originally named U.S. Pipe as a defendant, but it later agreed that U.S. Pipe was entitled to a judgment as a matter of law as to all claims.
[13] United and CMS amended this option agreement several times after its initial execution. The amendments changed the date set for the closing of the option agreement between United and CMS, modified the amount of land to be sold to CMS, and provided United and its affiliates additional rights to use the landfill it was developing on the land.
[14] Although the notices are undated, it appears that United's attorney forwarded the notices of default to Drummond by facsimile transmission on October 22, 2002.
[15] On March 7, 2005, United, Walter, JWR, and U.S. Pipe collectively answered Drummond's seventh amended complaint and United reasserted its counterclaims against Drummond.
[16] On February 14, 2005, United filed supplemental disclosures regarding the damages it sought to recover from Drummond. In this filing. United claimed damages for the mineable coal Drummond allegedly failed to remove from United's properties that were leased to Drummond. United estimated its damages to range between $120 and $350 million.
[17] The Kellerman lease was signed and notarized on January 12, 1968, and had an effective date of February 1, 1968.
[18] The effective date of the Cluster Springs lease was April 1, 1972; the lease was signed on June 6, 1972.
[19] As discussed in more detail below, from the record it appears that Drummond believed it had reached this same agreement with the trial court as to Walter. However, at the close of Drummond's case-in-chief, the trial court granted Walter's motion for a judgment as a matter of law, stating that Drummond had failed to establish an alter ego theory. On appeal, Drummond did not assert error as a result of these inconsistencies.
[20] Drummond obviously continued to pursue its theory that by virtue of the 1972 agreement it held property rights to coal on all of those properties belonging to United and located in the Warrior Coal Basin. The trial court rejected this theory and indicated that, because of the trial court's ruling on the tenancy-at-will issue, Drummond held property rights only in those properties expressly named in the four original leases, as amended. Because only a portion of the Carter Mine property was expressly covered by the four original leases, as amended, this ruling impacted Drummond's claim for damages resulting from the lease between United and TRI.
[21] Walter's counsel acknowledged that it was uncertain whether Walter remained a defendant.
[22] As noted above, the lease between United and TRI applied to the Carter Mine property. The Carter Mine property includes some of the same property addressed by the Kellerman lease. The Carter Mine property also includes some property that was not addressed by the Kellerman lease.
[23] At trial, there was obvious confusion as to whether Walter remained a party or whether the trial court had intended to enter a summary judgment in favor of Walter. At the beginning of the trial a colloquy between the trial judge and counsel for the parties established that Walter indeed remained a defendant and that, in order to prevail at trial on its breach-of-contract claim against Walter, Drummond was required to establish its alter ego theory. However, at another point in the colloquy, the trial judge appeared to agree with Drummond's counsel that Walter would not be treated as a remaining defendant for purposes of the trial. The trial judge appeared to agree with Drummond that Walter should be accorded the same treatment as JWR, i.e., that, if the court's previous ruling, presumably the summary judgment in favor of Walter, was reversed on appeal, Drummond would be allowed at that point to reinstate its claims against Walter.
[24] Because we agree with the trial court's ruling on the tenancy-at-will issue and the time limitations placed on Drummond's claims, we find no reversible error in the jury's award of $10 in nominal damages to Drummond. Walter and JWR cannot be liable for more in breach-of-contract damages than was United. Thus, even if we consider Drummond's claim to be one asserting that Walter and JWR are liable for a breach of the tenancy at will, which we note Drummond did not argue on appeal, Walter and JWR could be liable for, at most, $10 in damages.
[25] The parties argued this motion at a hearing before the trial court.
[26] Thus, United identified the person purportedly making the fraudulent statement, to whom the statement was made, and when the fraudulent statement was purportedly made. United also alleged that it had relied on Drummond's statement to its detriment.